# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Charles A.,<br><br>    Plaintiff,<br><br>v.<br><br>Nancy A. Berryhill,<br>Acting Commissioner of Social<br>Security,<br>    Defendant. | Case No. 18-cv-003 (HB)<br><br><br><br>**ORDER** |

HILDY BOWBEER, United States Magistrate Judge

  Pursuant to 42 U.S.C. § 405(g), Plaintiff Charles A. seeks review of the Acting Commissioner of Social Security's (the "Commissioner") denial of his application for disability insurance benefits ("DIB").[1] *See generally* (Compl. [Doc. No. 3]). The parties filed cross-motions for summary judgment. (Pl.'s Mot. for Summ. J. [Doc. No. 17]; Def.'s Mot. for Summ. J. [Doc. No. 19]).  For the reasons set forth below, the Plaintiff's Motion for Summary Judgment is denied and the Commissioner's Motion for Summary Judgment is granted.

---

[1] The Social Security Administrative Record ("R.") is available at Doc. No. 13.  For clarity, when citing to the record, the Court uses the pagination as marked in the record (on the bottom right of each page) rather than the CM/ECF pagination.

# I.    BACKGROUND

## A.    Procedural History

Plaintiff protectively filed for DIB on April 15, 2014. (R. 251–57).  Plaintiff alleged he was unable to work as a result of of traumatic brain injury, broken ribs, arthritis in both hands, broken wrists, a plate inserted into his right wrist, a right shoulder injury, obesity, somatoform disorder, personality disorder, chronic pain disorder, and possible attention deficit hyperactivity disorder.  He asserted an alleged onset date ("AOD") of June 16, 2011. *See, e.g.*, (R. 49, 348).

The ALJ issued an unfavorable decision on November 23, 2016.  (R. 47–68).  Pursuant to the five-step sequential evaluation procedure outlined in 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since at least his AOD of June 16, 2011. (R. 49).  At step two, the ALJ determined that Plaintiff had severe impairments of

> traumatic brain injury with residual cognitive deficits and post traumatic seizures; bilateral wrist fractures, status post open reduction and internal fixation on the right, and closed reduction and percutaneous pinning on the left; multiple right rib fractures, statues post fixation of the 8th rib; somatoform disorder; personality disorder; and possible attention deficit hyperactivity disorder.

(R. 49).  The ALJ found at the third step that no impairment or combination of impairments met or medically equaled the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 51–54).

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC")[2]

> to perform light work as defined in 20 CFR 404.1567(b), except no work at unprotected heights or near hazards; no more than frequent handling, fingering, or reaching; and routine, repetitive, simple work; with no more than brief and superficial contact with coworkers and supervisors . . .; and low stress, defined as no more than routine changes in the work process or work setting.

(R. 54). The ALJ also found at step four that Plaintiff was not able to perform his past relevant work as a stock clerk, construction laborer, auto parts clerk, and furniture assembler because "[t]his work all exceeds the light exertional level set forth in the above residual functional capacity." (R. 66–67).

At step five, however, considering Plaintiff's age, education, work experience, and RFC, the ALJ found Plaintiff could work in jobs that exist in significant numbers in the national economy, including: bench assembler, electronics worker, and cleaner. (R. 67). Thus, the ALJ concluded that Plaintiff was not disabled. (R. 68).

Plaintiff sought review by the Appeals Council, which denied his request. (R. 1–3). The ALJ's decision therefore became the final decision of the Commissioner. (*Id.*); *see also* 20 C.F.R. § 404.981. Plaintiff then commenced this action for judicial review.

Plaintiff contends the ALJ erred by failing "to properly evaluate vocational testing performed by Courage Kenny that demonstrated [Plaintiff] is not able to engage in

---

[2] An RFC assessment measures the most a person can do, despite her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ must base the RFC "on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).

competitive employment." *See* (Mem. in Supp. of Pl.'s Mot. for Summ. J., "Pl.'s Mem. in Supp." [Doc. No. 18 at 14–17]).

### B. Factual Background[3]

#### 1. Plaintiff's Background and Testimony

As of his date last insured, Plaintiff was thirty-seven years old, and therefore a "younger person." *See* 20 C.F.R. § 404.1563(c); *see also* (R. 115). Plaintiff has a high school education. *See* (R. 78–79, 200). He worked consistently before the AOD,[4] had some earnings in 2012, which did not rise to the level of substantial gainful activity, and appears not to have worked thereafter. *See, e.g.*, (R. 49, 258, 267–71).

Plaintiff's impairments can be traced to a June 16, 2011, workplace accident in which he "fell from the top of a tanker truck . . . , fractured both wrists, 6 ribs, punctured his lung, and sustained a [traumatic brain injury]. He had a plate placed in his[] chest cavity to keep his chest cavity expanded to be able to breathe without a respirator." (*Id.* at 733; *see also* (*id.* at 103–04 (Plaintiff's testimony that he fell from 15 or 20 feet head first onto asphalt))).

At the hearing before the ALJ on August 23, 2016, Plaintiff discussed his hand injuries and why they prevent him from working. (R. 87–88). For instance, Plaintiff stated that when he bends his left hand, he gets "a sharp shooting pain" and his right hand

---

[3] The Court has reviewed the entire administrative record thoroughly, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

[4] Based on Plaintiff's testimony and earnings, it appears that he worked only seasonally from 2007 until his AOD. *See* (R. 80, 258).

is "arthritic . . . . It's slow[, but] I can move it."  (R. 88).  Plaintiff testified his main

problem with his left wrist occurs when he tries to bend it.  (R. 107).  Plaintiff mentioned

that his right wrist does not hurt him as much as his left, but that it is "slower than the left

one." (*Id.*)  Plaintiff believed he could lift ten pounds at most with his left hand.  (R. 92).

Plaintiff did not believe he was capable of lifting any amount of significant weight with

his right hand.  (*Id.* ("The right side don't lift nothing anymore.")).  Plaintiff testified he

was not still receiving treatment for his hands because "[t]here is nothing more we can do

with my hands." (R. 83).

With respect to his activities of daily living, Plaintiff testified that he drives, but

that he uses his "left knee and [his] left hand" to control the wheel.  (R. 88).  He stated he

does not use his right hand to grip the wheel because "[t]he right side of my body is

trashed and the left side is what I'm learning to use."  (*Id.*)  Plaintiff also stated that he

can still use his right hand to feed himself and pick up silverware.  (*Id.*)  Plaintiff further

mentioned that he can use his right hand for perhaps ten to fifteen minutes before the pain

starts and that he has problems with both hands going numb.  (R. 90).  With respect to the

loss of sensation, Plaintiff stated that it takes minutes for the feeling to return, and while

experiencing these symptoms, he cannot use his hands at all.  (*Id.*)  Plaintiff estimated

that he experiences these symptoms approximately six times per day.  (*Id.*)  Plaintiff also

testified that he is able to use zippers, but prefers to wear clothes that do not use them,

like sweat pants instead of jeans.  (R. 89).  Plaintiff lives with his father and stepmother

(R. 95).  Plaintiff also testified that he pays his bills with his worker's compensation

money. (*Id.*)  Plaintiff stated he cooks frozen meals, like pizza and pot pies, and can fix

himself a sandwich.  (R. 96).  Plaintiff does not do any cleaning, but "will take the garbage out to the can."  (R. 97).  Plaintiff testified that he rarely watches television because he cannot concentrate on it.  (R. 98).

As to his rib and chest injuries, Plaintiff testified that he had a plate inserted into his chest to aid with breathing and the plate inhibits his ability to walk, stand, and sit for longer than about an hour. (R. 91–92).

Plaintiff testified that his traumatic brain injury has prevented him from working because he now has problems "with impulse control, a problem with patience.  I can't pay attention.  I can't remember."  (R. 94).   Plaintiff also testified that he is no longer getting treatment for these issues and that he did not remember who had told him that there was nothing more that could be done for him.  (R. 94–95).

Plaintiff testified, however, that he is continuing to see a seizure specialist. Plaintiff could not specifically speak to the frequency of his seizures because it he does not always know whether his symptoms are seizure symptoms or some other aspects of his cognitive difficulties. (R. 92–93).  With respect to his eyesight, Plaintiff testified that his left eye was "shot" and that he could barely see out of it.  (R. 93).  He acknowledged, however, that he renewed his license earlier in the summer and passed his vision test because he was wearing his glasses.  (R. 93).

There was also discussion during the hearing about the lengths to which Plaintiff had to go to obtain worker's compensation benefits.  Plaintiff's attorney described those efforts, but stated that "once the Courage Kenny report had become promulgated or

published, whatever, the insurance company gave up," and Plaintiff received his worker's compensation benefits. (R. 85).

Plaintiff also testified about coordinating with "a qualified vocational rehabilitation consultant [provided by the worker's compensation insurance provider] . . . to help me see if there's a pathway back to employment."  (R. 101).  He described being given "thousands of leads," applying for many of these, and going to "lots of interviews." (R. 101–02).   But at some point, "the insurance company gave up on . . . trying to find [him] work."  (R. 103).

### 2.    Vocational Expert Testimony

Steve Bosch, a vocational expert, testified before the ALJ.  *See generally* (R. 108–13).  First, the ALJ posed questions to Bosch regarding a hypothetical person capable of light work, lifting up to twenty pounds occasionally and ten pounds frequently, and further restricted to routine, repetitive, and simple work, avoiding unprotected heights or work near hazards, no more than frequent handling, fingering, or reaching, and no more than brief superficial contacts with coworkers and supervisors.  (R. 110).  Bosch opined that such a person could not perform Plaintiff's past relevant work. (R. 110–11).  That said, Bosch stated that the hypothetical person "could perform bench assembly tasks," be employed as an electronics worker, or do "some cleaner work or janitorial work at the light level."  (R. 111).

The ALJ also questioned Bosch regarding whether the hypothetical person above, with the additional limitations of being "unable to use the right dominant hand in work activity" and limited to the left nondominant hand, would be capable of competitive

employment in the identified jobs. (*Id.*) Bosch opined that would such a person would be unable to perform bench assembly tasks, or be employed as an electronics work, cleaner, or janitor, and did not suggest additional jobs that the hypothetical person with these additional limitations would be capable of performing. (*Id.*) Finally, the ALJ asked if that hypothetical person would be employable if he also had impulse control and impatience resulting in conflicts with supervisors and coworkers. (*Id.*) Bosch opined that "no employment would be possible" under those circumstances. (R. 111–12).

In response to questions by Plaintiff's attorney, Bosch opined that a hypothetical person with the limitations described above who also had "[a]n inability to sustain attention and concentration," would be incapable of competitive employment. (R. 113).

### 3. Relevant Medical Evidence

#### a. Wrist Pain and Range of Motion

Plaintiff was treated by a number of medical professionals in the aftermath of his workplace injury. Among these were occupational therapists who assisted Plaintiff with the injuries to his hands and wrists. For example, on September 9, 2011, Plaintiff saw occupational therapist Joanne Sypnieski. (R. 797–99). Sypnieski noted Plaintiff's statements that he was not having much wrist pain, and that his biggest concern was that his "[l]eft wrist doesn't move as well as the right." (R. 797). Objective testing also demonstrated improved grip strength over initial assessments. (R. 798). At his next visit on September 12, 2011, Plaintiff worked with Julie Henderson, another occupational therapist. (R. 801–04). At this visit Henderson opined that Plaintiff is "making gradual slow improvements" and had met "[s]everal goals . . . from initial eval." (R. 801). On

October 24, 2011, Henderson specifically mentioned that Plaintiff's right wrist "grip strength improved nicely" on the basis of the objective tests performed that day. (R. 849, 850). Henderson also noted that Plaintiff indicated he was using his right hand more than his left in activities of daily living. (R. 849). Additional visits with occupational therapists during this time frame demonstrate Plaintiff was continuing to improve, if slowly, and none of the treatment notes indicate setbacks, although there is also discussion of Plaintiff's progress plateauing, particularly regarding right wrist improvements. *See, e.g.*, (R. 806, 810, 814, 817, 822, 825, 829–30, 832, 837–38).

Plaintiff consistently reported no pain while at rest. *See, e.g.*, (R. 849 (chart for 9/12/2011, 10/5/2011, 10/14/2011, 10/17/2011, and 10/24/2011)). He consistently reported pain with use with respect to both wrists, but indicated significantly more pain in his left wrist than his right wrist. *See, e.g.* (*id.*). Specifically, Plaintiff rated his pain as varying between one to three out of ten for his right wrist and six to seven out of ten for his left wrist. *See, e.g.* (*id.*) His complaints of pain remained about the same throughout much of 2011, although he did indicate improvement with left wrist pain after he used a split on that wrist. *See, e.g.*, (R. 854).

On November 22, 2011, Plaintiff met with John Bowar, M.D., a staff physician working in rehabilitation services. (R. 953–54). During this visit, Dr. Bowar noted that Plaintiff's right wrist presented as unremarkable and "[m]otion grasp-release appeared to be good." (*Id.*) Dr. Bower did note some issues with Plaintiff's "left hand hyperflexion" and "some medial wrist pain." (*Id.*) Dr. Bower recommended Plaintiff start routine work-hardening for observed general physical deconditioning. (*Id.*) He suggested

Plaintiff work "on the ground" for the next three to four months. (*Id.*) Plaintiff told Dr. Bowar that his occupational therapy sessions had yielded "significant improvement." (R 954).

On February 6, 2012, wrist x-rays were generally unremarkable. (R. 974, 979). Also on February 6, 2012, Felicity Fishman, M.D., and Thomas Varecka, M.D., released Plaintiff to light duty work with restrictions that allowed him to lift and carry twenty to thirty pounds, but prohibited Plaintiff from working at heights. (R. 974, 978, 983). On March 23, 2012, in connection with a follow-up visit with Plaintiff, Dr. Bowar agreed with Dr. Fishman and Dr. Varecka's assessments. (R. 983).

On June 15, 2012, Plaintiff was seen by Krista Dierkhising, a speech language pathologist. (R. 1048). The appointment focused on Plaintiff's attempts to pass an upcoming driver's test at the DMV because "[h]e must pass this test in order to be able to work and drive." (*Id.*) During this appointment, Plaintiff stated that he recently began working a four- to five-hour shift driving a truck, but complained that he had trouble sleeping "because of the pain he is in from the bouncing in the truck." (*Id.*) Plaintiff indicated no issues with his wrists in this regard at that time. (*Id.*)

On January 18, 2013, when meeting with James Thomson, Ph.D., Plaintiff stated that he believed his right wrist was more functional than his left. (R. 1108). Also during the visit with Dr. Thomson, Plaintiff stated "that he nearly took a minimum wage job at Super America," because of frustrations trying to find a higher paying job. (R. 1107). Plaintiff also told Dr. Thomson that he had "done some fishing." (R. 1108). In December 2013, Plaintiff met with Jun Herrera, M.D. (R. 899–903). Plaintiff denied any

numbness or weakness and objective tests showed five out of five strength in the upper extremities and good hand coordination. (R. 900–01).

In March of 2014, Plaintiff saw Steven Lockman, M.D. (R. 1267.) Dr. Lockman stated he had last seen Plaintiff seven months earlier. (*Id.*) At this visit, Dr. Lockman opined that Plaintiff "is doing well from a functional standpoint." (*Id.*) May 2014 treatment notes from Nova McNally, an occupational therapist, indicate that Plaintiff believed he was better able to tolerate his home therapy routine. (R. 1282 (stating "I feel like the exercises are a little bit better."). Plaintiff reported no pain in his wrists at that visit. (*Id.*) In June 2014, Plaintiff was seen again by Dr. Lockman. (R. 1289–93). During this appointment, Dr. Lockman noted that Plaintiff possessed a "good grip." (R. 1290). In August 2016, Plaintiff saw Dr. Lockman, who reported that Plaintiff's last visit had been in November 2015. (R. 1479). Plaintiff's principal complaint at the August 2016 visit was related to pain in his right wrist, and not his left. (*Id.*) Dr. Lockman found that Plaintiff had only "[m]ildly reduced ranged of motion in terms of flexion-extension" in his right wrist and that "[s]ensation is intact. Strength is full." (*Id.*). Dr. Lockman noted this was the first time Plaintiff presented to him with complaints of right wrist pain. (*Id.*).

### b. Cognitive Impairments

As early as September 2011, Plaintiff indicated to the occupational therapists treating his wrists that he no longer needed to go to occupational therapy for his traumatic brain injury. *See, e.g.*, (R. 797, 801). In November 2011, Dr. Bower opined that Plaintiff had "recovered quite well" regarding his traumatic brain injury. (R. 953). Plaintiff also

indicated to Dr. Bower that he was not suffering from headaches, vision changes, hearing, or difficulties with mood or having problems in crowds or with overstimulation, and was "pretty happy with his recovery from a cognitive standpoint." (R. 954–55).  On this basis, Dr. Bower opined that "[f]rom a cognitive standpoint it seems that [Plaintiff] would be able to return to work." (R. 955).

On September 3, 2014, Plaintiff had a neuropsychological evaluation with Thomas Beniak, Ph.D. (R. 1436–46).  As part of his assessment, Plaintiff was given a WAIS-III IQ test.  This test demonstrated "[o]verall intellectual capability [that] falls in the upper end of the average range."  (R. 1436).  Dr. Beniak also noted particular areas of strength, including visuospatial reasoning, which Dr. Beniak described as "exceptional" and "falling into the very superior range."  In addition, Dr. Beniak stated Plaintiff "completed these tasks utilizing his nonpreferred left hand, this clearly negatively affecting his overall performance."  Dr. Beniak also noted that these results were consistent with previous results from an October 31, 2012, test.  (*Id.*).  Ultimately, Dr. Beniak concluded that Plaintiff's "intellectual and cognitive capacity would not prevent him from pursuing any number of vocational options should he be so motivated."  (R. 1446).  Dr. Beniak went on to opine that "[q]uite frankly, impediments to return to work are far greater with regard to his physical status . . . than are those related to his neuropsychological status." (*Id.*).  But Dr. Beniak noted that Plaintiff's physical needs related to areas "outside my area of expertise."  (R. 1445).

On September 9, 2014, in a visit with his treating neurologist, Frederick Langendorf, M.D., Plaintiff told Dr. Langendorf that he believed one of his medications,

Keppra, was making him more irritable. (R. 1346). In response to this concern, Dr. Langendorf prescribed Lamictal and had Plaintiff cease use of Keppra. (*Id.*) In follow-up visits, Plaintiff stated he believed his anger issues were better controlled. For example, in April 2015, Plaintiff was seen by Barbara Patrick, M.D., and noted that his irritability and anger issues were "much improved." (R. 1388). In November 10, 2015, Plaintiff was seen by Dr. Langendorf and stated that his anger issues were about ten percent of what they had been on Keppra. (R. 1453).

On October 14, 2014, in response to Plaintiff's attorney's request for a disability opinion, Dr. Beniak stated "I continue to believe that although [Plaintiff] does have some permanent, mild, short-term memory deficits from his traumatic brain injury, these difficulties are far outweighed by his numerous and often considerable intellectual and cognitive capabilities, especially those involving non-verbal and perceptual skills." (R. 1415).

In August 2016, Plaintiff told Dr. Lockman that his emotions were better controlled. (R. 1479).

### c.    Vocational Evaluation Reports

In August 2013, Plaintiff was evaluated by Susanne Grobe Ranheim, MS, a certified disability management specialist and a certified vocational evaluator. (R. 456–74). In her report, Ranheim stated that Plaintiff is capable of doing "the "laundry, washing dishes, [illegible], cooking, grocery shopping, basic cleaning, and taking the garbage out." (R. 459). She stated Plaintiff enjoys hunting and fishing, and went hunting in the fall of 2012, but that he was limited because he "couldn't shoot the gun." (*Id.*). She

noted that Plaintiff believed his memory issues had "improved since the injury as a result of using several methods to increase his memory including using Post-It notes, keeping two sets of keys, making lists, and keeping a day planner." (R. 460).

During the evaluation, Plaintiff was given multiple tests: the Career Ability Placement Survey ("CAPS"); the Career Assessment Inventory; and the Myers Briggs Type Indicator. (R. 461–64). The CAPS test results indicated that Plaintiff possessed aptitudes in spatial relations, word knowledge, and numerical ability, and had deficiencies in verbal reasoning, language usage, and perceptual speed and accuracy. (R. 461). Other scores, including Plaintiff's manual speed and dexterity, were normal. (*Id.*)

Ranheim also discussed Plaintiff's attempts at finding employment. For instance, she recounted how Plaintiff told her that "he is honest with potential employers about having restrictions, commenting 'Doctors orders. It is what it is. If an employer can accommodate, great, if not, oh well.'" (R. 465). Ranheim also noted that Plaintiff

> believes he is capable of performing a 10th of the physical labor he performed prior to the injury. For example, [Plaintiff] is unable to leave the ground, even on a step stool. *He declared this to be his most significant restriction*, which precludes him from returning to work as a Commercial Driver.

(*Id.* (emphasis added)).

When referencing Plaintiff's medical records, Ranheim stated that

> [p]ermanant restrictions were assigned on February 6, 2012, based upon the work-condition discharge report. [Plaintiff] is capable of working full-time within the Light to Medium physical demand level as defined by the Dictionary of Occupational Titles. [Plaintiff] is able to lift up to 50 pounds occasionally, floor to waist; 35 pounds occasionally, waist to eye level; 35 pounds bilateral carry; 40 pounds unilateral carry; and 10 pounds occasionally overhead.

(R. 466–67).  Ranheim also believed that "exploration of alternative vocational options is reasonable and necessary," given Plaintiff's physical limitations, high school education, and relevant job experience.  (R. 469–70).  She also believed Plaintiff's job searches were hampered because he

> was provided traditional services with regard to job seeking skills training rather than a customized search.  According to [Plaintiff], he did not receive training relative to the American With Disabilities Act (ADA), or instruction on how to communicate his physical and cognitive abilities to potential employers.  [Plaintiff] was not aware of the definition of an essential function and other requirements to disclose his restrictions as it relates to the essential function of the job.

(R. 473).

For these reasons, Ranheim concluded that Plaintiff "has permanent restrictions that preclude him from performing his pre-injury occupation.  In my opinion, [Plaintiff] has transferable skills and with proper direction in rehabilitation and job placement services, . . . would likely be working in some capacity." (*Id.*)  Ultimately, Ranheim concluded that "[b]ased upon all of the medical information provided, [Plaintiff] possesses the ability to work full-time with restrictions."  (R. 472).

In October 2015, Plaintiff was evaluated at Courage Kenny Rehabilitation Institute's Vocational Services Department.  (R. 404–15).  Leanne Jackson-Butala, MS, CRC, noted that "[Plaintiff] express[ed] an interest in working with helping dogs . . . . His work preferences included $20 an hour work wage, but how much he could work, he did not know . . . . He would like working outdoors part of the time." (R. 406).

Plaintiff was given a number of objective tests, including the Independent Problem Solving ("VALPAR No. 6") test. (R. 407–11). Jackson-Butala noted Plaintiff's poor performance on the VALPAR No. 6 test, also stating that Plaintiff took the test left handed.[5] Jackson-Butala further discussed Plaintiff's testing at the center, specifically noting that

> [h]e was given a 10 minute break in the morning and afternoon, and a 30 minute lunch break. . . . Once [he] started on a test or work sample, he worked steadily, although [he] could be seen shifting his weight when standing for 20 minutes, and at times, moving his neck and head, and rotating his right shoulder and stretching it above his head. When he was done with the six hour day, he was done, and ready to go home.

(*Id.*).

Jackson-Butala opined that Plaintiff "appears quite limited" in his ability to "return to a job at his previous wage or any job that offers suitable and gainful employment. He does not appear competitively employable." (R. 413). In support of this opinion, Jackson-Butala stated certain types of work, such as working with data, are not suitable "considering his lack of experience and interest." (R. 414). Jackson-Butala also noted that Plaintiff's performance on the VALPAR No. 6 test suggested Plaintiff fell "far below competitive entry level standards." (R. 411). In addition, based on Plaintiff's interests in working with dogs, Jackson-Butala suggested that Plaintiff volunteer "starting a couple hours a week as a way to possibly gain a positive and current work-life experience, references, stamina, confidence and for career exploration." (*Id.*) Once Plaintiff "finds he has the stamina, interest and ability," Jackson-Butala suggested that

---

[5] Plaintiff is right-hand dominant. *See, e.g.* (R. 87, 849).

Plaintiff utilize the State of Minnesota Vocational Rehabilitation Services for long-term job placement. (R. 414–15).

## II.  DISCUSSION

### A.  Legal Standard

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision.  42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)).  The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).  That said, the Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).  In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

### B.  Analysis

Plaintiff raises a single argument in his motion for summary judgment: that the ALJ erred by failing "to properly evaluate vocational testing performed by Courage

Kenny that demonstrated [Plaintiff] is not able to engage in competitive employment."[6]
*See* (Pl.'s Mem. in Supp. at 14–17).   Plaintiff argues that "[t]he Courage Kenny report is also consistent with other evidence in the record."  (*Id.* at 17).

### 1.      Courage Kenny Report

Plaintiff essentially argues that the Courage Kenny report was entitled to deference because the Institute was obviously respected by another vocational expert, Ms. Ranheim, who had suggested that "Plaintiff would benefit from services from the Courage Kenny Rehabilitation Institute" (*id.*), and the report was obviously credited by Plaintiff's worker's compensation carrier, who approved his claim after receiving it.  (*Id.* at 17–18).   Thus, Plaintiff contends that in light of the credence thus accorded to the report by other vocational experts and the insurance carrier, the Courage Kenny report should have been viewed by the ALJ as dispositive of the disability determination now before the Court.

But it is well-settled that a determination in the worker's compensation context that a claimant is unable to work is not dispositive of the disability determination to be made by the ALJ in the Social Security context.  *See Loeffler v. Massanari*, 23 F. App'x 605, 606 (8th Cir. 2001) (concluding that claimant's reliance on "statements by her

---

[6] In his Complaint, although not in his Motion for Summary Judgment, Plaintiff also assigns error to the manner in which the ALJ considered the opinions of certain of Plaintiff's treating physicians, and in particular claims that the ALJ mischaracterized the opinions of Dr. Beniak and Dr. Lockman.  (Compl. at 3).  Arguably, these issues are waived because they were not briefed in Plaintiff's Motion for Summary Judgment.  *See Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008) (finding the claimant waived issues not raised before the district court).  However, in an abundance of caution, the Court will also address these arguments herein.

doctors that were related to her workers' compensation claim is misplaced because a disability determination by another agency is not binding on the Social Security Administration, *see* 20 C.F.R. §§ 404.1504, 416.904 (2001)"). Instead, so long as the ALJ provides a reasonable basis supported by substantial evidence of record for discrediting other evidence, the Court must defer to those determinations. *See Hogan v. Apfel,* 239 F.3d 958, 962 (8th Cir. 2001) (explaining that deference to ALJ is appropriate when ALJ explicitly discredits claimant and presents a reasonable basis for doing so).

Here, the ALJ provided many reasonable bases for her decision not to give the Courage Kenny report controlling weight. First, the ALJ concluded that the manner in which Plaintiff was evaluated at Courage Kenny did not comport with the medical evidence. Specifically, the ALJ stated that the VALPAR No. 6 test, which was a critical part of the foundation for Jackson-Butala's determination that Plaintiff cannot be competitively employed, was unreliable because Plaintiff took the test with his left hand but is right hand dominant and the medical record did not support a conclusion that Plaintiff was unable to use his right hand for this purpose. (R. 65–66). The ALJ observed that "the medical records document primarily left hand/wrist complaints until August 2016[7], and even then no objective findings to support right hand/wrist complaints were noted." (R. 65–66).

Relatedly, the ALJ also discounted the findings of the Courage Kenny evaluator because Plaintiff's "subjective complaints regarding his physical and mental symptoms appear to have been accepted in full" by the evaluator, whereas the ALJ "found the full

---

[7] The Courage Kenny evaluation was in October 2015, nearly a year earlier.

extent of the claimant's subjective complaints to be unsupported by the record as a whole." (R. 66.) An ALJ must consider several factors in evaluating a claimant's subjective symptoms, in addition to whether the symptoms are consistent with the objective medical evidence. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also* Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (S.S.A. Mar. 16, 2016). These factors include the claimant's daily activities; work history; intensity, duration, and frequency of symptoms; side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions. *Polaski*, 739 F.2d at 1322; SSR 16-3p, 2016 WL 1119029, at *5. The ALJ need not explicitly discuss each factor, *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005), however, and a court should defer to the ALJ's findings when the ALJ expressly discredits the claimant and provides good reasons for doing so. *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990).

Here, the ALJ properly analyzed Plaintiff's subjective complaints, and there is ample evidence in the record to support the ALJ's conclusion that Plaintiff was neither as impaired as he alleged, nor as impaired as the Courage Kenny evaluator believed him to be. With respect to Plaintiff's subjective complaints regarding his physical impairments, the ALJ pointed to inconsistencies with the medical records and with the extent of Plaintiff's activities of daily living. (R. 56-57, 65-66). The ALJ also found Plaintiff's statements regarding his alleged impairments were not consistent with other statements he made in other settings. *See* (R. 55–57). For example, as it relates to Plaintiff's wrists, Plaintiff testified that he was incapable of using his right wrist generally and that specifically Plaintiff did not believe he was capable of lifting any amount of significant

weight with his right hand. (R. 92 ("The right side don't lift nothing anymore.")). But these statements are inconsistent with his statements to his occupational therapists that he had relatively less discomfort with his right wrist when compared to his left wrist. (R. 797, 806, 810, 814, 817, 822, 825, 829–30, 832, 837–38). Further, Plaintiff's belief that he is not capable of using his right hand is inconsistent with the reports of his occupational therapists that Plaintiff was using his right hand more than his left for activities of daily living. *See, e.g.*, (R. 853). In similar fashion, Plaintiff's statement about his lack of lifting capability is inconsistent with the assessments of Drs. Bowar, Fishman, and Varecka that Plaintiff was able to return to "light" work. *See, e.g.*, (R. 974, 978, 983). For these and other reasons, the ALJ concluded that the "evidence does not support the claimant's testimony regarding no ability to use the right hand for any lifting, driving, opening a car door, starting a car, or putting gas in a car, or for any activities whatsoever up to six times per day." (R. 56). An ALJ may discredit a claimant on the basis of these types of inconsistent statements. *See, e.g.*, *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003); *see also Polaski*, 739 F.2d at 1322; SSR 16-3p, 2016 WL 1119029, at *5.

Similarly, the ALJ's discussion of Plaintiff's subjective complaints regarding his cognitive impairments also reveals a reasonable basis founded on substantial evidence in the record to conclude that his impairments are not as disabling as alleged. Again, the ALJ found Plaintiff's "wide range of reported activities, including household chores, shopping, driving, handling his own finances, fishing, hunting, and working as a commercial truck driver" significant in her decision to discount Plaintiff's subjective

reports of the effect of his cognitive impairments. (R. 63); *see also* (R. 64) (referring to Plaintiff's "reported activities involving living with friends and family members . . . shopping, paying his bills in person, going to the library, . . . attending medical appointments, and pursuing extensive job search activities"). In addition, as with his physical complaints, there were statements made by Plaintiff about his cognitive abilities that were not consistent with his own statements made in other contexts and not consistent with the medical records. For example, Plaintiff testified at the hearing that his traumatic brain injury prevented him from working because he now has problems "with impulse control, a problem with patience." (R. 94). But the record clearly demonstrates that Plaintiff reported to his doctors that his anger and patience issues were well controlled after he switched medications. (R. 1388, 1453, 1479). In addition, Dr. Beniak opined on more than one occasion that Plaintiff's cognitive impairments were not an impediment to his ability to work.[8] (R. 1415, 1445–46). Thus, the ALJ determination discrediting Plaintiff's subjective complaints regarding his cognitive impairments is also supported by substantial evidence. *Accord Polaski*, 739 F.2d at 1322; SSR 16-3p, 2016 WL 1119029, at *5.

The ALJ also discounted the Courage Kenny report because the evaluator appeared to focus on a standard of employability that, while appropriate to the workers' compensation context, was not relevant to Social Security disability proceedings, and

---

[8] The Court also notes that Plaintiff testified that his left eye is "shot." (R. 93). Despite this testimony, Plaintiff also testified that he was able to renew his driver's license recently and passed the vision test because he was able to use glasses. (R. 94). Furthermore, Plaintiff's vision "was correctable to about 20/25 in both eyes." (R. 1410).

because it took into account Plaintiff's employment preferences. (R. 65.) Plaintiff argues that this was a mischaracterization of the Courage Kenny report. (Pl.'s Mem. in Supp. at 15–16). But even assuming, a*rguendo,* that the ALJ mischaracterized the report in this regard, it was only one of a number of reasons why the ALJ chose not to give substantial weight to the findings of the Courage Kenny report. *See, e.g.*, (R. 65–66); *see also Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir.2005) (stating deference is warranted where ALJ's credibility determination is supported by good reasons and substantial evidence).

In this regard, Plaintiff's reliance on *Ekeland v. Bower*, 899 F.2d 719 (8th Cir. 1990), is misplaced. In *Ekeland*, the Eighth Circuit concluded that the ALJ erred "by ignoring the findings of the claimant's vocational expert and instead relying on the testimony of a government vocational consultant." 899 F.2d at 721. But this is not what occurred in the instance case. Here, the ALJ received differing opinions from vocational experts Ranheim, Jackson-Butala, and Bosch, and had to determine which, if any, she found credible. She made that determination, and she provided a reasonable, evidence-based rationale for it. *See Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians."); *cf. Ekeland*, 899 F.2d at 721–22. For these reasons, the Court finds that the ALJ did not err in choosing not to give substantial weight to the opinions expressed in the Courage Kenny vocational report.

## 2. Plaintiff's Other Challenges to the ALJ's Determination

Although not directly raised by Plaintiff's motion, because of the interplay between the opinions of certain medical providers and the Courage Kenny report, the Court also considers the manner in which the ALJ addressed the opinions of these physicians. Specifically, the Court concludes that the ALJ's credibility determinations regarding opinions rendered by Dr. Lockman and Dr. Beniak were supported by substantial evidence in the record as a whole.

The ALJ gave little weight to Dr. Lockman's opinion that Plaintiff was totally disabled "due to cognitive and affective deficits," noting that "his treatment records contain no observations regarding specific disabling mental symptoms or limitations or how they would preclude work." (R. 64). The ALJ also noted that Dr. Lockman's opinion was premised on Plaintiff's "'ability to find and hold a job, and not his physical condition.'" (*Id.* (quoting R. 1371)). She also described the ways in which Dr. Lockman's opinion—specifically regarding Plaintiff's cognitive impairments—was not consistent with the record evidence. (R. 63–64).

As discussed above, there is substantial evidence in the record demonstrating that Plaintiff's primary cognitive complaint—irritability and impulse control—was better controlled after Plaintiff switched to Lamictal. (R. 1388, 1453, 1479). Indeed, Plaintiff discussed this with Dr. Lockman, but Dr. Lockman's opinions do not appear to reflect that improvement. (R. 1479). Thus, the ALJ's decision to give Dr. Lockman's little weight because it is inconsistent with other evidence is appropriate and supported by substantial evidence. *See, e.g.*, *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)

("[A]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." (alteration in original) (internal quotation marks omitted)); *see also Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010 ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling." (internal quotation marks omitted)).

The ALJ's decision to give great weight to Dr. Beniak's opinion that Plaintiff's "intellectual and cognitive capacity would not prevent him from pursuing any number of vocational options should he be so motivated," (R. 62–63, 1446), is likewise supported by substantial evidence in the record as whole. For example, the ALJ noted that Plaintiff's test scores reported by Dr. Beniak were consistent with the results of other similar tests administered to him, and substantial evidence in the record supports this conclusion. Furthermore, the ALJ found significant Dr. Beniak's comment on Plaintiff's poor performance on portions of the cognitive tests, which Dr. Beniak attributed to Plaintiff's use of his nondominant hand. (R. 63). In sum, the ALJ concluded "Dr. Beniak's opinion . . . is fully supported by his evaluation report, and by other cognitive testing and observations in the record." (*Id.*) The Court finds this conclusion to be supported by substantial evidence in the record as a whole.

III.   CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Charles A.'s Motion for Summary Judgment [Doc. No. 17] is

   **DENIED**; and

2. The Acting Commissioner of Social Security's Motion for Summary

   Judgment [Doc. No. 19] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 25, 2019

_s/ Hildy Bowbeer_

HILDY BOWBEER
United States Magistrate Judge
